FILED

NOV 26 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

Anthony Oliver., Plaintiff Pro Se
1502 Benton Blvd, # 5108
Savannah, Georgia 31407
(912) 220-5842 (Telephone)
Anthony.oliver29@gmail.com

*Plaintiff Appearing Pro Se*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

CRB

ANTHONY OLIVER,

            Plaintiff,

v.

Lyft, Inc., a Delaware Corporation;
and DOES 1 through 10, inclusive.

            Defendants.

Case No. CV 18 7166

**COMPLAINT FOR DAMAGES
AND INJUNTIVE RELIEF**

1. Whistleblower Retaliation in
   Violation of Sarbanes-Oxley Act
2. Violations of the Fair Credit Reporting
   Act, 15 U.S.C. § 1681, et seq.
3. Retaliation in Violation of California
   Labor Code § 1102.5
4. Wrongful Termination in Violation
   of California Public Policy
5. Unfair Business Practices of California
   Business & Professions Code § 17200
6. Intentional Infliction of Emotional Distress

**DEMAND FOR JURY TRIAL**

**Complaint for Damages
and Injunctive Relief**

Plaintiff Anthony Oliver ("Plaintiff"), demanding a jury trial, alleges on full information and belief, the following in support of his complaint against the Defendant Lyft, Inc., ("LYFT").

## JURISDICTION AND VENUE

1.     This action arises under the whistleblower protection provisions of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A *et seq.*, the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.*, and violations of Labor Code § 1102.5., California Business & Professional Code § 17200 *et seq.*, other state law claims, as well as injunctive relief. Jurisdiction is invoked pursuant to 28 U.S.C. § 1331, as well as under 28 U.S.C. § 1343(a)(4), and 28 U.S.C. §§ 2201 and 2202. This suit is authorized and instituted pursuant to the above federal statutes. The jurisdiction of this Court is invoked to secure protection of and to redress deprivation of rights secured by the Sarbanes-Oxley Act, and violations of the FCRA. This court has ancillary jurisdiction of the state law claims because they are sufficiently related to the federal claims. Supplemental jurisdiction is conferred because Plaintiff and Defendant are residents of separate states and the amount exceeds $ 75,000.

2.     Venue is proper under 28 U.S.C. § 1391 because Defendant's principal place of business is in this judicial district. Venue is also proper because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## INTRADISTRICT ASSIGNMENT

3.     Pursuant to L.R. 3-2(c) and (d), this action is properly assigned to the San Francisco Division of the Northern District of California because a substantial portion of the events giving rise to the dispute occurred in San Francisco, California.

## PARTIES

4.     Plaintiff Anthony Oliver, ("hereafter PLAINTIFF"), resides in the County of Chatham, the State of Georgia. Plaintiff was hired by Defendant ten (10) months ago. Plaintiff was to perform and fulfill rides from the Defendant to its passengers. Prior to hiring the PLAINTIFF, the Defendant required the Plaintiff to download the Lyft driver application using a smart phone that all proposed drivers must have. After downloading the application, PLAINTIFF was required to consent to a back-ground check. Plaintiff applied for a driver job during the month of February of 2018. Defendant LYFT performed a back-ground check on the PLAINTIFF, and after waiting a week and a half for the results, PLAINTIFF was hired by the Defendant and began referring rides to the PLAINTIFF almost immediately. As time went on, PLAINTIFF excelled at his job rising to one of the best drivers in the region. Plaintiff received large money bonuses from the LYFT for his hard work. In addition, PLAINTIFF also has received high performance feedback by thousands of passengers from four (4) different states that PLAINTIFF worked in for LYFT. As time progressed, the PLAINTIFF discovered that the Defendant was robbing drivers of their money, taking and deducting more money then what the Defendant was entitled to, then committing federal Antitrust violations. Once proven true, PLAINTIFF then began cooperating with the Federal Bureau of Investigation, and the Security Exchange Commission. Plaintiff then filed a federal lawsuit in this Court to bring to light these violations. As the facts will demonstrate through this lawsuit, PLAINTIFF reasonably believed that he has uncovered numerous violations of federal and state law by Defendant. Plaintiff immediately demanded Arbitration from the Defendant by contacting the Defendants'

1   general counsel, however, Defendant and their general counsel did nothing to
2   assist the PLAINTIFF.

3       5.      Once the allegations were published in a federal lawsuit filed in
4   this Court, as well as the Defendant discovering that the PLAINTIFF did in fact
5   contact the FBI, Defendant repeatedly threatened, harassed, suspended the
6   PLAINTIFF on four (4) separate occasions, and ultimately fired for trying to do
7   the right thing. Defendant concedes in their termination notice to the Plaintiff,
8   that it was the Plaintiff's background check that failed, and this is why
9   Defendant decided to terminate the Plaintiff. As stated above, Defendant hired
10  the Plaintiff ten (10) months ago, conducted a background check on the
11  Plaintiff, provided him with a copy, and Plaintiff began driving for the
12  Defendant instantly. On or about October 20, 2018, Defendant emailed Plaintiff
13  to inform him that the Defendant was conducting a background check, and that
14  is failed. Defendant provided a copy of the back-ground check, and was the
15  same exact background check that the Defendant provided Plaintiff when they
16  hired him ten (10) months ago, and nothing changed in the back-ground check.
17  Coincidentally, the Defendant terminated the Plaintiff the following day that the
18  Defendant discovered that the Plaintiff contacted the FBI in Manhattan New
19  York.

20      6.      Defendant Lyft, Inc, ("hereafter Lyft or Defendant"), is a Delaware
21  Corporation existing under the laws of the State of California. Defendant Lyft
22  maintains its principal place of business in San Francisco, California. For the
23  past four years preceding this lawsuit, Defendant has found itself being sued by
24  several state and federal government agencies. Defendant has been served with
25  over two hundred (200) lawsuits in this Country since its founding in 2012 and
26  has dominated the ride share market by cheating, stealing, and committing

27

28

1  violations of state and federal law to gain a tactical advantage over their own
2  drivers, and passengers.

3      7.      Plaintiff alleges on information and belief that: (1) each Defendant
4  acted in all matters relevant to this action as the agent of the other Defendant
5  and carried out joint business plans and operations; and (2) the acts and
6  omissions of each Defendant are legally attributable to the other Defendant.

7      8.      Plaintiff is currently ignorant of the true name(s) and the
8  capacities, whether individual, corporate, associate, or otherwise, of the
9  Defendants sued herein under the fictious names DOES 1 through 10, inclusive,
10 and therefore, sues such civil Defendants by such fictitious names. Plaintiff will
11 seek leave to amend this Complaint to allege the true names and capacities of
12 said fictitiously named Doe Defendants is legally responsible in some manner
13 for the events and is also sued pursuant to California Code of Civil Procedure
14 474.

15     9.      Plaintiff is informed and believes and thereon alleges that
16 Defendants, including the fictitious Doe Defendants, were at all times acting as
17 actual agents, conspirators, ostensible agents, partners and/or joint ventures and
18 their employees of all other Defendants, and that all acts alleged herein
19 occurred within the course and scope of said agency, employment, partnership,
20 and joint venture, conspiracy, or enterprise, and with the express and/or implied
21 permission, with such knowledge, consent, authorization and ratification of
22 their co-Defendants however, each of these allegations are deemed "alternative"
23 theories whenever not doing so would result in a contraction with the other
24 allegations.  Whenever the Complaint refers to any act of the Defendants, the
25 allegations shall be deemed to mean the act of those Defendants names in the

26
27
28

1 | particular cause of action, and each of them, acting individually, jointly and
2 | severally.

3

4 | **EXAUSTION OF REMEDIES**

5 | 10.   On or about November 1, 2018, Plaintiff timely filed complaints
6 | with federal agencies including the United States Department of Labor,
7 | Occupational Safety and Health Administration, and filed a charge with the
8 | Equal Employment Opportunity Commission. To date, Plaintiff has received a
9 | right to sue letter from each agency.

10 | **FACTUAL ALLEGATIONS**
11 | 11.   "LYFT" is a familiar smartphone-app driven taxi service. While
12 | characterizing its drivers as independent contractors, Lyft exercises enormous
13 | control over its drivers' 'independent' businesses, such as instantly terminating
14 | a driver's 'businesses at the drop of a hat.

15 | 12.   LYFT's smartphone app and business model are highly similar to
16 | the smartphone app and business model of the earlier and highly-successful
17 | 'ridesharing' service, Uber. 14. Lyft competes with Uber in the same market;
18 | and each of these two leading "transportation network companies" must
19 | compete against taxi service.

20 | 13.   Since its 2012 launch, LYFT has enjoyed astounding growth,
21 | achieving a market value of $11 billion in less than 5 years' time. LYFT's said
22 | growth rate is remarkable, particularly in light of Uber's 3-year head-start, viral
23 | growth rate, and competitive pricing, designed to undercut taxi prices in all but
24 | the most extreme markets, by an average of 30%.

25 | 14.   Defendant hires drivers around the Country by advertising on their
26 | website that LYFT is in need of drivers in various states. Defendant also offers
27 | sign on bonuses to entice new drivers.

28 | **Complaint for Damages**                        6
**and Injunctive Relief**

15.     On or about February 3, 2018, PLAINTIFF went to the Defendants website and applied for a driver position using the Defendants' online driver application that the Defendant posts on their website. PLAINTIFF was required to enter a phone number, email address and relevant pertinent information so that LYFT would consider the PLAINTIFF for a driver position.

16.     After PLAINTIFF entered his personal information, PLAINTIFF was then informed by the Defendant that LYFT would conduct a back-ground check on the PLAINTIFF, and the Defendant demanded PLAINTIFFS' consent to run the back-ground check. After successfully consenting to a back-ground check, LYFT then required PLAINTIFF to download the LYFT driver smart phone application to his iPhone. From there, Defendant did in fact conduct a back-ground check on the PLAINTIFF.

17.     With almost two weeks approaching, Defendant LYFT emailed PLAINTIFF to inform him that he was hired as a driver, and provided the PLAINTIFF with a copy of his back-ground check.

18.     Once PLAINTIFF was hired by the Defendant, PLAINTIFF excelled at his job as a driver. PLAINTIFF did such a great job at driving for the Defendant, that LYFT permitted the PLAINTIFF to drive in four different states in the United States. As time went home, PLAINTIFF received high dollar money bonuses for his excellent job performance.

19.     Over the next several months, PLAINTIFF discovered that the Defendant was in fact stealing money from the PLAINTIFF, and other drivers throughout the United States. Further, PLAINTIFF discovered that LYFT had breached the agreement with the PLAINTIFF in which Defendant advertises that they pay the driver, such as the Plaintiff, 75 % percent of the fare, and that Defendant takes 25 % percent of the fare.

20.     Plaintiff began investigating the Defendant as money was being taken from the PLAINTIFF without the PLAINTIFFS consent. At various dates and times, PLAINTIFF would notice significant amounts of money being taken by the Defendant from PLAINTIFFS Lyft driver account. Once PLAINTIFF confirmed that the Defendant was taking money from his account, PLAINTIFF then began sending letters to the Defendant demanding that the Defendant stop their illegal business practices. However, the Defendant never responded to the PLAINTIFFS demand letters, much less changed their business practices.

21.     As time went on, PLAINTIFF discovered that LYFT was taking more money then what was allowed, or that LYFT agreed to pay PLAINTIFF for his work.

22.     During the month of July of 2018, PLAINTIFF began sending emails to LYFT general counsel Kristin Sverchek, ("SVERCHEK") with notice of demand for arbitration. At no time did LYFT respond nor acknowledge the PLAINTIFFS requests for arbitration.

23.     On August 11, 2018, PLAINTIFF sent more demand letters to LYFT demanding arbitration between the parties. This time, PLAINTIFF informed LYFT and SVERCHEK that PLAINTIFF would be reporting LYFT to the Federal Bureau of Investigation, ("FBI"), and the Security Exchange Commission, ("SEC") for what PLAINTIFF uncovered was LYFT committing federal Antitrust Violations to defraud consumers as well as investors. Again, neither LYFT, nor SVERCHEK responded to the PLAINTIFFS demand letters.

24.     Days turned into weeks, and PLAINTIFF still received no written, phone, or email responses from the Defendant.

25.     As general counsel, SVERCHEK is mandated to instruct LYFT to participate in arbitration between PLAINTIFF and LYFT. However, SVERCHEK refused to do so.

26.     On August 15, 2018, after not hearing from the Defendant, nor general counsel, PLAINTIFF reported general counsel SVERCHEK to the State Bar of California.  Once SVERCHEK discovered that she was subject to State Bar accusations, LYFT had enough of the PLAINTIFF so LYFT decided that it would be in the PLAINTIFFS best interest, and retaliate against him anyway they could.

27.     Coincidentally, on August 18, 2018, the PLAINTIFF was at home and that same night, PLAINTIFF attempted to log in to his LYFT application, and was unsuccessful. Once the LYFT application was opened, a message from LYFT appeared on the phone screen, and the message from LYFT was to inform the PLAINTIFF that his LYFT driver account was deactivated, and that the PLAINTIFF needed to contact LYFT for more details. At the same time, LYFT sent PLAINTIFF an email indicating that LYFT received notice from a "member of the Lyft community" stating that PLAINTIFF was involved in a "multi-car" accident, and that PLAINTIFF was driving for LYFT when he "hit three cars, four people, and fled the scene of an accident."

28.     In the mentioned email from LYFT, a representative demanded to know that facts of the alleged accident, and LYFT also demanded photos of the alleged damage to the PLAINTIFFS vehicle. With no end in sight, PLAINTIFF decided to contact the Savannah Georgia Police Department. That same night, the police arrived at PLAINTIFFS home, and PLAINTIFF informed the police about the nature of the allegations that LYFT made against PLAINTIFF. There, the Savannah Georgia Police ran PLAINTIFFS license plate, drivers license, and personal information into a statewide police database called National Crime Information Center, ("NCIC"), and had PLAINTIFF been in accident, hit several people as LYFT claims, then PLAINTIFF and his vehicle would appear in NCIC and PLAINTIFF would have been detained.

**Complaint for Damages**
**and Injunctive Relief**                                              9

29.     After the police were at the PLAINTIFFS home for almost an hour, police databases determined that PLAINTIFF was never in an automobile accident, and there was no damage to PLAINTIFFS vehicle as LYFT asserted when they elected to suspend the PLAINTIFF from his job. PLAINTIFF believes, and thereon alleges that this was just the beginning phase of LYFT's retaliation.

30.     As the next several weeks went by, Defendant LYFT continued to caused more damage to the PLAINTIFF. As an example, at various dates, and times, Defendant did unlawfully interfere with the PLAINTIFFS economic advantage by knowingly slowing down PLAINTIFFS Lyft driver application by causing the LYFT application to freeze after the PLAINTIFF clicked the accept button. By causing the LYFT application to freeze, LYFT then prevented the PLAINTIFF from accepting ride requests and earning money. Instead, the Defendant had pinned their hopes that PLAINTIFF would just quit working for LYFT, and move on. Instead, PLAINTIFF called LYFT daily to complain about the interference with the rides, and one LYFT representative stated on the telephone; "well you shouldn't be complaining about the boss."

31.     Over the next several weeks, PLAINTIFF with the help of a private investigator, began further investigating Defendant LYFT for various crimes that Defendant was committing. As weeks went by, PLAINTIFF talked to over 750 LYFT drivers nationwide. Through this investigation, PLAINTIFF determined that LYFT was, and still is engaging in committing State and Federal Antitrust violations to beat their competitors, both their own LYFT driver employees, as well as their rival, Uber Technologies, Inc.

32.     With evidence in hand, PLAINTIFF then began to proceed by filing a federal lawsuit in this Court against the Defendant. By filing a federal complaint against LYFT, the Defendant knew that they would be exposed to State and Federal investigations.

33.     On September 3, 2018, PLAINTIFF filed a federal lawsuit against LYFT in Federal Court of the Northern District of California. Once Defendant was served with the lawsuit, they knew they were officially exposed as the PLAINTIFF conclusively provided that LYFT has, and continues to engage in violations of Federal Antitrust laws. To carry out the Antitrust violations, its simple. Defendant uses an algorithm to operate the LYFT application. By doing so, LYFT uses the algorithm to generate two separate receipts for both the passenger and driver. One receipt will show that a passenger paid $ 27.00 dollars for the ride and fare. But then LYFT sends the driver a receipt showing the driver that the passenger only paid $ 21.00 for the ride and fare. By forming two receipts, it allows LYFT to not only inherit the $ 5.00 difference, but it also allows LYFT to take their usual 50 percent of the $ 21.00 thereby leaving the driver to only make $ 10.00 to 13.00 dollars after driving the passenger over 35 miles. At the end of the day, LYFT has netted more money for doing absolutely nothing. The only way LYFT could carry out this scheme is by committing a clear violation of the Federal Antitrust laws.

34.     Notwithstanding the facts that PLAINTIFF has been investigating the Defendant for months, as well as exposing the Defendant for violations of State and Federal law, Defendant LYFT knew they had to act ever hard and faster to get rid of the PLAINTIFF. With pressure mounting for private LYFT investors, and the board of directors, LYFT knew they had to do more then just interfere with PLAINTIFFS application and preventing PLAINTIFF from accepting rides.

35.     On October 5, 2018, Defendant suspended PLAINTIFF for false allegations that PLAINTIFF was "drinking and driving while picking up lyft passengers at the airport."

36.     That same day, PLAINTIFF attempted to log in and perform his everyday duties of picking up passengers, however PLAINTIFF was prevented from accepting rides due to a message appearing on PLAINTIFFS telephone that he needs to contact LYFT support. Once PLAINTIFF contacted LYFT support, PLAINTIFF was informed that LYFT received a "confidential call" from a "member of the Lyft community" that PLAINTIFF did in fact consume alcohol, and went to the nearby airport, and picked up several passengers. At no time did LYFT provide PLAINTIFF with any evidence of any wrong doing.

37.     Further, Defendant emailed the PLAINTIFF to inform him that LYFT would place PLAINTIFFS account on suspension pending the outcome of an investigation. PLAINTIFF then contacted the airport police who in turn obtained video footage from security cameras at the airport showing that the PLAINTIFF was never at the airport at the time that LYFT suggested.

38.     The very next day, PLAINTIFF voluntarily traveled to a state of the art, certified medical laboratory for a drug and alcohol screening performed by providing hair and urine samples to a lab. With the testing that is available today, drug and alcohol providers have a way to obtain urine and hair samples from persons who can then in turn take the sample, test it for the presence of drugs and alcohol, and the tests itself can go back up to 90 days. Because the PLAINTIFF went to a lab the very next day, PLAINTIFF did not have anything to worry about, so PLAINTIFF paid a lad $ 149.00 to prove that PLAINTIFF never consumed any alcohol or drugs. The lab informed the PLAINTIFF that the results would be returned within 72 hours, and the results came back within 48 hours.

39.     The results were staggering. A highly respected doctor opined and determined by a triable fact that the PLAINTIFF never consumed any form of alcohol, and that all of the tests were negative for the presence of alcohol and drugs. This came as a surprise to absolutely no one. Once PLAINTIFF obtained his tests results, PLAINTIFF then emailed the results to the Defendant to show that PLAINTIFF did not drink and drive, and PLAINTIFF then demanded to be reinstated to driving for LYFT. Defendant had no choice but to admit that they lied to the PLAINTIFF, and was fraud on the part of LYFT. Defendant was furious as they thought they had the PLAINTIFF. With no end in sight, LYFT now knew they had to step up their game in order to get rid of the PLAINTIFF and silence him before the Defendant could be facing a federal indictment, or a civil penalty or lawsuit from a State or Federal government agency. Defendant knew they had to act fast.

40.     Defendant knew they more then just false allegations of causing a car accident, and drinking and driving to justify getting rid of the PLAINTIFF and to cover up their Federal crimes.

41.     Defendant, again, who hired PLAINTIFF almost a year ago, and subjected PLAINTIFF to a background check, was hired with that same exact back ground check.

42.     On October 5, 2018, PLAINTIFF contacted the news media, as well as the Federal Bureau of Investigation, ("FBI"), and the Security Exchange Commission, ("SEC") to report LYFT to federal law enforcement. PLAINTIFF contacted the FBI office in Manhattan New York, and an investigation was opened against LYFT for the violations of Federal Antitrust violations. Several days later, LYFT was advised of the investigation, and informed that PLAINTIFF was cooperating with federal police to take down the Defendant, and subject LYFT to civil and criminal penalties.

Complaint for Damages                          13
and Injunctive Relief

43.     On October 9, 2018, just four days after LYFT suspended the PLAINTIFF for allegations of drunk driving, Defendant LYFT, acting without the PLAINTIFFS consent, decided to run another back-ground check on the PLAINTIFF. Prior to employment, PLAINTIFF only provided his consent to do a back-ground check once prior to being hired. At no time, did the PLAINTIFF give his consent a second time, or any other time permitting the Defendant to keep running PLAINTIFFS back ground at their whim of caprice.

44.     Defendant then used a company called Checkr, Inc., ("CHECKR") to run PLAINTIFFS back ground a second and third time. Defendant then obtained the back-ground check from CHECKR, and from there informed the PLAINTIFF that he was officially being terminated due to the alleged fact that PLAINTIFFS back ground check failed. CHECKR then emailed PLAINTIFF a copy of the back-ground check, and was the same exact back ground check that LYFT and CHECKR performed on the PLAINTIFF. Again, PLAINTIFF never provided his consent a second time to run his back-ground check.

45.     CHECKR then emailed the PLAINTIFF a second time to inform him of his rights to contest the back-ground check for inaccuracies. Plaintiff did in fact file a dispute with CHECKR due to CHECKR providing false criminal convictions under the same name as PLAINTIFF, but with a different date of birth, or different race. Plaintiff then initiated his dispute with CHECKR.

46.     However, before CHECKR could complete their investigation to determine the accuracy of the PLAINTIFFS back ground check, Defendant LYFT terminated the PLAINTIFF despite knowing that PLAINTIFF filed a dispute with CHECKR. Despite federal laws that prevent an employer from terminating the PLAINTIFF, or any employee pending a Fair Credit Reporting Act, ("FCRA") dispute, Defendant LYFT knew, or should have known that adverse action such as the denial of employment, or termination could not take

**Complaint for Damages
and Injunctive Relief**                    14

place until the dispute and investigation is complete. Defendant knew, or had reason to know that they were violating federal law. The FCRA seeks to protect consumers from being adversely affected by information in reports that are or is inaccurate.

47.    With PLAINTIFFS FCRA dispute still pending with CHECKR, Defendant LYFT decided to violate the FCRA and terminate PLAINTIFF from his employment.

48.    On October 21, 2018, PLAINTIFFS termination became effect as Defendant insisted at best, that PLAINTIFF was terminated due to a failure in the PLAINTIFFS background check. Despite the fact that PLAINTIFF never consented to a second background check, LYFT insisted now that they had the PLAINTIFF.

49.    At no time did LYFT ever provide PLAINTIFF with a summary of his FCRA rights as guaranteed by the FCRA.

50.    Defendant LYFT is a criminal organization that operates under the pretenses that they obey the law, take care of their employees, and pay takes to the government, all of which is not true.

51.    Defendant will likely provide a volley of reasons as to why the PLAINTIFF was terminated from his employment. Defendant came up with a laundry list of suspensions, false allegations, and slowing/freezing the LYFT application that PLAINTIFF used for the scope of employment. Defendant will likely attempt to persuade this Court into believing that PLAINTIFF was fired for his background check. If that's the case as they insist, then Defendant clearly violated the FCRA by not providing PLAINTIFF with a summary of his rights, nor waiting the outcome of an investigation dispute prior to terminating the PLAINTIFF. If Defendant somehow can't get pasted that hurdle, then the

Defendant will then likely have somewhere a list of false reasons to justify the termination of the PLAINTIFF.

52.     What is known here, is that the PLAINTIFF was terminated for cooperating with federal law enforcement, filing a federal lawsuit exposing the Defendants federal Antitrust violations, as well as Defendant admittedly terminating the PLAINTIFF before an FCRA investigation was complete in violation of the FCRA.

53.     The negative adjudication of PLAINTIFFS employment occurred prior to PLAINTIFF being notified in writing of that fact and prior to the PLAINTIFF being provided with a copy of the report or any meaningful opportunity to dispute it, not once, but on two separate occasions. In fact, LYFT *never* sent to Plaintiff a copy of the background report by CHECKR used in its hiring process or a summary of rights under the FCRA, as required by FCRA section 1681b(b)(3).

54.     As a direct result of LYFT'S unlawful adoption and use of the credit report by CHECKR, along with the adjudication of PLAINTIFFS employment status, PLAINTIFF lost his job, and was provided no meaningful opportunity to be made aware of what information was being reported.

55.     In violation of the FCRA, LYFT failed to comply with the FCRA's mandatory pre-adverse action notification requirement, and failed to provide a copy of the background report it obtained from CHECKR along with a full summary of rights, *before* talking adverse action, as required by the statute of 15 U.S.C. § 1681b(b)(3). Every year, individuals who have applied to Lyft for employment have been similarly aggrieved by the same violation of 15 U.S.C. § 1681b(b)(3).

56.     Again, to date, CHECKR who is the background check company that LYFT contracts with, still has not completed their investigation into the

**Complaint for Damages**                                16
**and Injunctive Relief**

PLAINTIFFS dispute concerning improper criminal convictions. As such, Defendant LYFT thereby has violated the FCRA.

57.    LYFT willfully and negligently violated section 1681b(b)(3) of the FCRA by failing to provide PLAINTIFF with the following; (a) the required Pre-Adverse Action Notice; (b) a copy of the consumer report; and, (c) a written description of the consumer's right under the FCRA. Additionally, as previously mentioned above, PLAINTIFF never provided his consent to the Defendant a second time to run a background check on the PLAINTIFF.

58.    As a LYFT driver for the Defendant, PLAINTIFF averaged about $ 5,000 dollars month in take home salary. Here, PLAINTIFF is entitled to past, future, and compensatory damages.

59.    As a direct result of the actions of the Defendant, PLAINTIFF was left with no income, suffering from depression as PLAINTIFF was unable to find immediate employment, had to borrow money, and seek extensions of time to pay house hold bills.

60.    In addition, the actions of the Defendant were intentional, reckless, caused serious injury to the PLAINTIFF thereby justifying an award of punitive damages pursuant to California Code of Civil Procedure § 3294.

## FIRST CAUSE OF ACTION

### (Retaliation in Violation of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A)

### Plaintiff v. Defendant

61.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

62.    At all material times Section 806 of the Sarbanes Oxley Act of 2002 was in effect and binding on Defendant. It prohibits employers such as Defendant from discharging, constructively discharging, demoting, threatening, harassing or in any manner discriminating or retaliating against any employee

**Complaint for Damages**                    17
**and Injunctive Relief**

because he or she provided information, caused information to be provided, or assisted in an investigation by a federal regulatory or law enforcement agency, or an internal investigation by the company relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations or violations of federal law relating to fraud against shareholders. In addition, an employer may not discharge or in any manner retaliate against employee because he or she filed, caused to be filed, participated in, or assisted in a proceeding relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations or violations of federal law relating to fraud against shareholders. If an employer takes retaliatory action against an employee because he or she engaged in any of these protected activities, the employee can file a complaint with the Secretary, United States Department of Labor, Occupational Safety and Health Administration ("OSHA").

63.     Plaintiff timely filed a whistleblower complaint with OSHA, and OSHA issued Plaintiff a right to sue letter

64.     Defendant harassed, threatened, discharged and retaliated against Plaintiff, and disclosed his entity as a whistleblower, after Plaintiff made oral and written complaints regarding what he reasonably believed to be illegal or unlawful conduct in violation of state and federal statutes, rules and regulations. Plaintiff made these complaints against his employer, by and through its agents and employees, as well as to the EEOC, the OCC and OSHA.

64.     Plaintiff is informed and believes, and thereon alleges that because of his making complaints regarding Defendant's illegal conduct and/or conduct Plaintiff reasonably believed to be illegal, Plaintiff was discharged from his employment and/or otherwise discriminated and retaliated against by Defendant after he had made the aforesaid complaints about illegal conduct.

65.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered and will continue to suffer pain and mental anguish and emotional distress.

66.     Plaintiff has further suffered and will continue to suffer a loss or earnings and other employment benefits, whereby Plaintiff is entitled to general compensatory damages in amounts to be proven at trial.

67.     Defendant's actions constituted a willful violation of the abovementioned federal laws and regulations. As a direct result, Plaintiff has suffered and continues to suffer substantial losses related to the loss of wages and is entitled to recover costs and expenses and attorney's fees in seeking to compel Defendant to fully perform its obligations under state and federal law, in amounts according to proof at time of trial.

68.     The conduct of Defendant described hereinabove was outrageous and was executed with malice, fraud and oppression, and with conscious disregard for Plaintiff's rights, and further, with the intent, design and purpose of injuring Plaintiff.

69.     Defendant committed the acts alleged hereinabove by acting knowingly and willfully, with the wrongful and illegal deliberate intention of injuring Plaintiff, from improper motives amounting to malice, and in conscious disregard of Plaintiff's rights. Plaintiff is thus entitled to recover nominal, actual, compensatory, punitive and exemplary damages in amounts according to proof at the time of trial, to the full extent allowable by law, in addition to any other remedies and damages allowable by law.

70.     As a proximate result of the actions and conduct described hereinabove, which constitute violations of Section 806 of the Sarbanes-Oxley Act of 2002 ("SOX"), Plaintiff has been damaged in an amount according to

proof at the time of trial, and seeks make-whole relief, back pay, future pay, civil penalties and costs against Defendant pursuant to SOX.

## SECOND CAUSE OF ACTION

### (Violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681b(b)(3))

### Plaintiff v. Defendant

71.   Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

72.   Plaintiff is a "consumer," as defined by the FCRA, 15 U.S.C. § 1681a(c).

73.   The Sterling background report ordered by Lyft is a "consumer report" within the meaning of 15 U.S.C. § 1681a(d).

74.   The FCRA provides that any person "using a consumer report for employment purposes" who intends to take any "adverse action based in whole or in part on the report," must provide the consumer with a copy of the report *and* a written description of the consumer's rights under the FCRA, as prescribed by the Federal Trade Commission, before taking such adverse action. 15 U.S.C. § 1681b(b)(3)(A).

75.   For purposes of this requirement, an "adverse action" includes "any . . . decision . . . that adversely affects any current or prospective employee." 15 U.S.C. § 1681a(k)(1)(B)(ii).

76.   Defendant Lyft is a "person" and regularly uses background reports for employment purposes. 15 U.S.C. § 1681a(b).

77.   The FCRA requires Lyft, as a user of consumer reports for employment purposes, before taking adverse action based in whole or in part on the report, to provide to the consumer to whom the report relates, a copy of the report and a written description of the consumer's rights under the FCRA. See 15 U.S.C. §§ 1681b(b)(3)(A)(i) and (ii).

78.     Lyft further violation the FCRA as Defendant terminated the Plaintiff prior to an investigation and dispute being completed.

79.     Lyft willfully and negligently violated section 1681b(b)(3) of the FCRA by failing to provide Plaintiff with notice before using such reports: (a) the required Pre-Adverse Action Notice; (b) a copy of the consumer report; and, (c) a written description of the consumer's rights under the FCRA.

## THIRD CAUSE OF ACTION

### (Retaliation in Violation of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, 15 U.S.C. § 78u-6(h)

### Plaintiff v. Defendant

80.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

81.     At all times material hereto, Section 78u-6 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank") was in effect and binding on Defendant. It permits individuals who allege discharge or other discrimination to bring an action in United States District Court for relief.

82.     90. Dodd-Frank prohibits employers from discharging, demoting, suspending, threatening, harassing, directly or indirectly, or in any other manner discriminating against whistleblowers in the terms and conditions of employment because of any lawful act done by the whistleblower in providing information to the SEC, in initiating, testifying in, or assisting in any investigation or judicial or administrative act of the SEC based upon or related to such information, or in making disclosures that are required or protected under SOX, Dodd-Frank, and any other law, rule or regulation subject to the jurisdiction of the SEC.

83.   Plaintiff is a whistleblower within the meaning of Dodd-Frank, as evidenced by his conduct described in each paragraph.

84.   Defendant harassed, threatened, discharged and retaliated against Plaintiff, and took other adverse actions against Plaintiff, including disclosing his entity as a whistleblower, after Plaintiff made oral and written complaints regarding what he reasonably believed to be illegal or unlawful conduct in violation of state and federal statutes, rules and regulations. Plaintiff made these complaints to his employer, by and through its agents and employees, as well as to the SEC, the EEOC, the FBI, and OSHA.

85.   Plaintiff is informed and believes, and thereon alleges that because of his making complaints regarding Defendant's illegal conduct and/or conduct Plaintiff reasonably believed to be illegal, Plaintiff was discharged from his employment and/or otherwise discriminated and retaliated against by Defendant after he had made the aforesaid disclosures and complaints about illegal conduct.

86.   As a direct and proximate result of Defendant's actions, Plaintiff has suffered and will continue to suffer pain and mental anguish and emotional distress.

87.   Plaintiff has further suffered and will continue to suffer a loss or earnings and other employment benefits, whereby Plaintiff is entitled to general compensatory damages in amounts to be proven at trial.

88.   Defendant's actions constituted a willful violation of the above-mentioned federal laws and regulations. As a direct result, Plaintiff has suffered and continues to suffer substantial losses related to the loss of wages and is entitled to recover costs and expenses and attorney's fees in seeking to compel Defendant to fully perform its obligations under state and federal law, in amounts according to proof at time of trial.

89.     The conduct of Defendant described hereinabove was outrageous and was executed with malice, fraud and oppression, and with conscious disregard for Plaintiff's rights, and further, with the intent, design and purpose of injuring Plaintiff.

90.     As a proximate result of the actions and conduct described hereinabove, which constitute violations of Dodd-Frank, Plaintiff has been damaged in an amount according to proof at the time of trial, and seeks all relief allowable by law including without limitation double back pay, injunctive and declaratory relief, make-whole relief, civil penalties, litigation costs, and expert witness fees against Defendant pursuant to Dodd-Frank.

## FOURTH CAUSE OF ACTION

### (Wrongful Termination In Violation of Public Policy)

### Plaintiff v. Defendant

91.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

92.     113. At all times material hereto, Section 806 of the Sarbanes Oxley Act of 2002 was in effect and binding on Defendant. This law prohibits employers such as Defendant from discharging, constructively discharging, demoting, threatening, harassing or in any manner discriminating or retaliating against any employee because he or she provided information, caused information to be provided, or assisted in an investigation by a federal regulatory or law enforcement agency, or an internal investigation by the company relating to alleged mail fraud, wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations or violations of federal law relating to fraud against shareholders. In addition, an employer may not discharge or in any manner retaliate against employee because he or she filed, caused to be filed, participated in, or assisted in a proceeding relating to alleged mail fraud,

**Complaint for Damages**                                          23
**and Injunctive Relief**

wire fraud, bank fraud, securities fraud, violations of SEC rules and regulations or violations of federal law relating to fraud against shareholders, customers, and consumers.

93.     At all times material hereto, Section 78u-6 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank") was in effect and binding on Defendant. Dodd-Frank prohibits employers from discharging, demoting, suspending, threatening, harassing, directly or indirectly, or in any other manner discriminating against whistleblowers in the terms and conditions of employment because of any lawful act done by the whistleblower in providing information to the SEC, in initiating, testifying in, or assisting in any investigation or judicial or administrative act of the SEC based upon or related to such information, or in making disclosures that are required or protected under SOX, Dodd-Frank, and any other law, rule or regulation subject to the jurisdiction of the SEC.

94.     At all times mentioned in this complaint, California Labor Code Section 1102.5 was in full force and effect and was binding on Defendant. This law requires Defendant to refrain, among other things, from retaliating against employees who refuse to participate in or condone conduct they reasonably believe to violate state or federal law.

95.     Title 18 USC § 1343 defines the crime of wire fraud under federal law, and provides in pertinent part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money…. by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

96.    Title 18 USC § 1341 defines the crime of mail fraud under federal law, and provides in pertinent part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money…. for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, r deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both."

97.    California Business & Professions Code § 17200 provides that unfair competition shall mean any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising and any act prohibited by Section 17500, *et seq.*, of the Business & Professions Code. Section 17203 of the Business & Professions Code provides that a court of competent jurisdiction may enjoin any conduct constituting unfair competition under § 17200.

98.    Each of the aforesaid laws is a fundamental policy of the State of California.

99.    Plaintiff believes and thereon allege that his whistleblowing, refusing to condone illegal activity, and engaging in protected activity, was or were a motivating factor in Defendant's conduct as alleged hereinabove, including terminating Plaintiff.

100.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has sustained and continues to sustain physical injuries, pain and suffering, and extreme and severe mental anguish and emotional distress; and Plaintiff has suffered and continued to suffer a loss of earnings and other

employment benefits. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

101.   Defendant's conduct as described above was willful, despicable, knowing, and intentional; accordingly, Plaintiff seeks an award of punitive and exemplary damages in an amount according to proof.

102.   Plaintiff previously filed the case of Oliver v. Lyft, Inc., et al., USDC NDCA, Case # 3:18-cv-05505-MMC. In this case, Defendant concedes in their non-opposition to compel arbitration, that Plaintiff stated a claim for relief which included federal RICO and Antitrust claims, all of which consists of mail fraud, wire fraud, and a laundry list of state and federal violations.

## FIFTH CAUSE OF ACTION

### (California Business Professionals Code § 17200 et seq.)

### Plaintiff v. Defendant

103.   Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

104.   Defendant's conduct as alleged above violates multiple state and federal laws and constitutes unlawful business practices within the meaning of California Business & Professions Code § 17200, *et seq.*

105.   Plaintiff is informed and believes and thereon alleges that Defendant continues to engage in some or all of the aforementioned unfair and unlawful business practices.

106.   Plaintiff seeks an injunction prohibiting Defendant from engaging in the unfair and unlawful conduct described herein.

## SIXTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

### Plaintiff v. Defendant

107.   Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

108.   Defendant engaged in outrageous conduct towards Plaintiff with the intention to cause, or with reckless disregard for the probability of causing, Plaintiff to suffer severe emotional distress, and with wanton and reckless disregard for the injurious result to Plaintiff, as set forth hereinabove. The conduct set forth hereinabove was extreme and outrageous and an abuse of the authority and position of Defendant. The above-described conduct was intended to cause severe emotional distress, or was done in conscious disregard of the probability of causing such distress. This conduct exceeded the inherent risks of employment and was not the sort of conduct normally expected from an employer.

109.   As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has sustained and continues to sustain pain and suffering, extreme and severe mental anguish and emotional distress; Plaintiff has suffered and continues to suffer a loss of earnings and other employment benefits. Plaintiff is thereby entitled to general and compensatory damages in amounts to be proven at trial.

110.   Plaintiff is informed and believes and thereon alleges that Defendant and its managing agents, managers, officers, and/or directors committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice or oppression, and in conscious disregard of Plaintiff's rights.

## SEVENTH CAUSE OF ACTION

### (Declaratory and Injunctive Relief)

### Plaintiff v. Defendant

111.   As a separate and distinct cause of action, Plaintiff complains and realleges all of the allegations contained in this complaint, and incorporates them by reference into this cause of action as though fully set forth herein, excepting those allegations which are inconsistent with this cause of action.

112.   A dispute and an actual controversy has arisen between the parties regarding the enforceability of a document purporting to compel Plaintiff to arbitrate certain claims against Defendant.

113.   Plaintiff asserts that under Armendariz v. Foundation HealthCare (2000) 24 Cal.4th 83 and its progeny, as well as under SOX and Dodd-Frank, and the public policies of California and the United States, that the document is unenforceable for a number of reasons as set forth in statutes and the case law. On information and belief Defendant asserts that the document is enforceable and that Plaintiff must bring his claims in arbitration.

114.   Plaintiff desires a judicial determination of the parties' rights and obligations of the parties with respect to the document, and a declaration that the arbitration document is invalid because it lacks mutuality, is procedurally and substantively unconscionable, and violates public policy.

115.   A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiff may ascertain his rights and duties under the alleged arbitration agreement, and not be forced to forgo his constitutional right to a trial by jury.

116.   Plaintiff does not seek to avoid the alleged agreement to arbitrate unless the alleged arbitration agreement is declared invalid and/or unenforceable.

117.   Therefore, this Court should order Defendant Lyft, Inc., to reinstate the Plaintiff to his employment pending the outcome of this litigation.

118.   Therefore, this Court should request that the United States Attorneys' office for the Northern District of California to investigate the Defendant and their criminal and civil misconduct.

///
///
///

**Complaint for Damages**
**and Injunctive Relief**

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff Anthony Oliver prays for the following relief:

1.     A determination that Defendants' conduct as alleged herein is unlawful and/or unfair;

2.     An award to Plaintiff of actual, compensatory, and punitive damages, as proven at trial pursuant to Cal.Civ.Code.P. § 3294;

3.     An award to Plaintiff of restitution of all monies deducted by Defendants as a result of their unlawful and/or unfair business practices;

4.     An order enjoining Defendants from engaging in the unlawful and/or unfair business practices described herein;

5.     An award to Plaintiff of all fees, costs, and pre- and post-judgment interest; and

6.     Restitution in an amount to be determined at trial;

7.     Disgorgement of unjust enrichment in an amount to be determined at trial;

8.     An order from this Court requesting that the United States Attorneys' office investigate the Defendants for their criminal and civil misconduct and enterprise;

9.     Such further and other relief the Court deems reasonable and just.

Dated: November 18, 2018

Respectfully submitted,

By: _____

Plaintiff Anthony Oliver, Pro Se

Complaint for Damages
and Injunctive Relief

30

# JURY DEMAND

Pursuant to Seventh Amendment to the United States Constitution, Plaintiff hereby respectfully requests a trial by jury.

Dated: November 18, 2018

Respectfully submitted,

By: _____

Plaintiff Anthony Oliver, Pro Se